**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LAQUAN JOHNSON,**

                                        **Plaintiff,**

        **-against-**                                        **5:14-CV-1376**

**NYS OFFICE OF MENTAL HEALTH,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                        **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Laquan Johnson commenced this action asserting claims of hostile work

environment, intentional discrimination, and unlawful retaliation in violation of Title VII of

the Civil Rights Act of 1964 ("Title VII").  _See_ Compl. dkt. # 1.  Defendant NYS Office of

Mental Health ("Defendant" or "OMH") moves for summary judgment, dkt. # 28, which

Plaintiff opposes.  Dkt. # 32.  The Court has considered all of the parties' submissions,

including Defendant's Reply, dkt. # 34, in reaching this decision.   For the reasons that

follow, the motion is granted in part and denied in part.

**II.     STANDARD OF REVIEW**

        The Court will apply the well-settled standards for deciding summary judgment

motions in Title VII actions.  _See_ Fed. R. Civ. P. 56(a); _Weinstock v. Columbia Univ._, 224

F.3d 33, 42 (2d Cir. 2000);  _Bracci v. N.Y.S. Dept. of Correctional Services_, 2005 WL

2437029, at * 1 (N.D.N.Y. Sept. 30, 2005) (McAvoy, S.J.).   These standards will not be repeated.   Suffice it to say that where, as here, the intent of one party is in question but there is no direct evidence of discrimination, the Court must carefully examine the reasonable inferences that could be drawn from the totality of the circumstantial evidence and be cautious about granting summary judgment. *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006).   Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## III.    BACKGROUND[1]

All facts are viewed in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

### a.  Plaintiff's Employment

Plaintiff was initially hired by Defendant in May 2012 at its Hutchings Psychiatric Center to work as a Mental Health Therapy Aide.  Def. SOMF ¶ 1.  On February 21, 2013, Plaintiff transferred to Defendant's Central New York Psychiatric Center (CNYPC) to work as a Secure Care Treatment Aide (SCTA). *Id.* ¶ 2.   Due to this transfer, Plaintiff held his SCTA position at CNYPC as a provisional employee. *Id.* ¶ 3.  A CNYPC provisional employee, as opposed to either a probationary or permanent employee, may be terminated at any time with no reason given. *Id.* ¶ 4.

---

[1]Unless indicated otherwise, the facts set forth above are taken from the parties' Local Rule 7.1(a)(3) Statements of Material Facts ("SOMF") that are admitted by the opposing party, properly supported by the record, or deemed admitted for failing to provide proper factual opposition. See Local Rule 7.1(a)(3). The Court will set forth only those facts that are relevant to deciding the instant motion.

2

**b.  June 20, 2013 Incident**

On June 20, 2013, Plaintiff was involved in the restraint of RH, a resident at CNYPC.  *Id.* ¶ 5.  Plaintiff and CNYPC employee John Santomassino restrained RH in the shower room and placed him on a restraining bed. *Id.* ¶ 6.  Once restrained on the bed, RH was placed in a "side-room" on CNYPC Ward 404. *Id.* ¶ 7.  As indicated by the video recordings from June 20, 2013, the side-room is an extremely small room such that RH's head (at the head of the bed on which he was restrained) was approximately 6-12 inches from the doorway into the side room. *See* Def. Ex. D, disc 1, 21:50.

Video taken when RH was first placed in the side room shows numerous staff members congregated outside the door to the side room, with Plaintiff being present for a short period but positioned behind the group obstructing the doorway.  Defendant contends that, during this initial period, CNYPC staff member Hans Kunz entered the side room and threatened RH.  Plaintiff admits that Kunz entered the room, but contends that given the number of people outside of the door having their own conversations, and Plaintiff's position behind these people, he could not hear what was being said between Kunz and RH.  Pl. EBT, pp. 78-79.

A short time later, and while RH was still restrained on the bed in the side room, Plaintiff was assigned to serve as RH's "one-on-one monitor." Def. SOMF ¶ 10.  Video taken of the side room during this period shows Plaintiff sitting on a chair in the doorway of the side room with his feet extended over the threshold and into the room, almost under RH's head.  *See* Def. Ex. D, disc 1, 22:20.  Plaintiff can be heard conversing with RH regarding the location of RH's footwear. *Id.* at disc 2, 22:21.

3

A few minutes later, Plaintiff can be seen moving his chair out of the way so that Santomassino can enter the side room. *Id.* at 22:25; Def. SOMF ¶ 11. The video shows Santomassino attempting to close the door behind him as he enters, but Plaintiff moving his chair forward so that Plaintiff's head and knees are inside the doorway, blocking the door at approximately three-quarters of the way closed. Def. Ex. D, disc 2, 22:25; Pl. EBT p. 88. Once in the side room, Santomassino stands next to RH's bed adjacent to RH's waist, facing RH's head and Plaintiff (who can still be seen seated in the doorway). Santomassino appears to be approximately 4-5 feet from Plaintiff. Inside the room, Santomassino can be heard saying to RH: "If you don't push the issue, I won't push the issue," to which RH can be heard responding: "Do what you gotta do. First [inaudible] that comes up here, I'm telling what happened. Bottom line, fourth time I've been attacked at this facility." Def. Ex. D, disc 2, 22:25. Santomassino can be heard retorting: "Not by me," and then telling RH again not to "push the issue" and to "take time to think about it." *Id.* Plaintiff can be seen sitting in the doorway while this conversation is occurring. At his deposition, Plaintiff testified that while watching the video recording he could hear what was being said in the side room between Santomassino and RH, but that he "can't recall" whether he actually heard the conversation on the date in question because he did not "know where [his] mind was at" due the fact that he had previously been involved in the stressful situation of subduing RH. Pl. EBT pp. 89-90.

The video also depicts that after Santomassino leaves the side room, the door is left completely open and, a few minutes later, Plaintiff can be heard conversing with RH. Def. Ex. D, at disc 2, 22:27, 22:29; at disc 3, 22:30.

4

### c.  Plaintiff's Discharge

In connection with the June 20, 2013 incident, RH filed an abuse complaint alleging that he was physically injured and threatened with physical harm by staff members at CNYPC.  Def. SOMF ¶ 15.   A CNYPC Risk Management Office employee, Regan Mundy, investigated RH's allegations. Def. SOMF ¶ 16.  Mundy interviewed Plaintiff about RH's complaint on July 2, 2013. *Id.* ¶ 17.   Mundy then hand-wrote a three page statement based on her interview with Plaintiff, and provided the statement to Plaintiff for his signature.  Def. SOMF ¶ 18; Mundy Dec. ¶ 11.  Plaintiff signed all three pages of the statement, with his signature on each page appearing under the affirmation: "I have read this document (had it read to me) and this information contained on this page accurately represents my statement to the interviewer.  Affirmed this 2 day of July 2013." Def. SOMF ¶ 19; Pl.  EBT p. 60, L.10-20; Mundy Dec. ¶11, Exhibit 1.  Plaintiff asserts, however, that the statement differed from his contemporaneous notes from the incident; that the statement he was shown at his deposition was "altered" since he  signed it; and that he was forced to sign the statement or be discharged.  Pl. EBT pp. 57-72; Pl. Aff. ¶¶ 18-19.

The hand-written statement signed by Plaintiff reads in pertinent part: "I monitored [HR] for a little while; he was mute the entire time.  The only time he would talk was if the Nurse would ask him a question.  A female Nurse, maybe Owens.  No one else went into the side room. The only time any one went in to the side room was with the Nurse." Def. SOMF ¶ 20.  Plaintiff acknowledges that this written statement is contradicted by the video evidence, and that the statement that "no one else went into the side room" was materially false.  *Id.* ¶¶ 21-22.  The written statement also recounts that RH remained "mute the

entire time," yet the video recording depicts Plaintiff engaging RH in numerous conversations during the time he served as RH's one-on-one monitor. Def. SOMF ¶ 23.

Mundy contends that the contradictions between Plaintiff's statement to her and the video recordings from the June 20, 2013 incident caused her to refer Plaintiff to CNYPC's Human Resources Department to determine whether Plaintiff submitted a false statement related to the investigation. Mundy Dec. ¶18. Laurie Cresswell, Associate Personnel Administrator in CNYPC's Human Resources Department, was assigned to conduct the Human Resources investigation. Cresswell Dec. ¶7.

Cresswell viewed the video recordings with Mundy, and the two compared the videos to the written statement that Plaintiff signed. Mundy Dec. ¶¶16-17; Cresswell Dec. ¶ 12. Both Cresswell and Mundy noted the contradictions between the written statement and the videos. Cresswell Dec. ¶¶1 5-19; Mundy Dec. ¶ 17. Defendant contends that because Plaintiff was not truthful when he gave his statement to Mundy, and because he was a provisional employee, he was terminated on August 20, 2013. Bardo Dec. ¶ 9. Plaintiff contends that he was terminated because of his race, and because he had filed a complaint against a co-worker regarding race-based derogatory statements (discussed next). *See* Pl. Aff. ¶¶ 27-28; Pl. EBT p. 53.

### d. Co-Worker Race-Based Derogatory Statements

Plaintiff and Mirsda Krupic were employed at CNYPC within the same SCTA 1 title. Def. SOMF ¶ 29. Plaintiff asserts that Krupic called him a "nigga!" on July 1, 2013, and had previously made other similar racist comments toward him. *Id.* ¶ 30. On July 1, 2013 Plaintiff made his first, and only, complaint relative to Krupic's treatment of him. *Id.* ¶ 31.

Plaintiff used CNYPC's standard procedure to file this complaint. *Id.* ¶ 32.

Relative to the complaint, Plaintiff was initially interviewed on July 1, 2013 by Tarita

Mills, CNYPC's affirmative action officer. *Id.* ¶¶ 33, 38; Pl. EBT p.37, L.19 – p.40, L.2.

Mills also prepared a written complaint that Plaintiff filed, contending:

> On July 1, 2013 Mr. Johnson reported to a supervisor Mr. Daniel Gerety that Ms. Krupic entered the dayroom and asked to use the computer at which he replied yes, but would need to log off first.  Ms. Krupic then became agitated and mumbled out of her mouth to him "You Nigga!"  Mr. Johnson said dating back to June 24, 2013 he has been targeted by Ms. Krupic who has on occasion called him a "Nigger" and questioned his level of education. Mr. Johnson states he had been keeping it to himself but is very confused as to why Ms. Krupic makes it her business to make these inappropriate comments to him whether they work on the same unit or not especially, since he has never disrespected her.  In questioning his level of education Mr. Johnson quoted her as saying, "I am foreigner, you are American[,] I am smarter, I have Master's Degree in my country, what do you have?"  Following the last incident upon being relieved from his post in the dayroom, Mr. Johnson made the report to his supervisor.

Def. Ex. B.

The matter was then referred to Marisol Nunez-Rodriguez, the Director of CNYPC's

Bureau of Diversity Planning and Compliance, who oversaw the investigation into

Plaintiff's complaint against Krupic.  Def. SOMF ¶ 34;[2] Nunez-Rodriguez Dec. ¶ 5.  The

investigation was conducted in accordance with the Governor's Office of Employee

Relations' (GOER) Ten Step Internal Complaint Investigation Process. Def. SOMF ¶ 35;

Nunez-Rodriguez Dec. ¶¶ 4 & 14 and Exhibit 1.  Nunez-Rodriguez assigned Mills to

conduct the investigation. Def. SOMF ¶ 36.

---

[2]Plaintiff denies many of Defendant's allegations concerning the investigation into his complaint against Krupic, although most lack a sufficient basis for the denial.  For example, Plaintiff denies the contention, supported by Nunez-Rodriguez's declaration, that Nunez-Rodriguez oversaw the investigation.  In support of his denial, Plaintiff merely asserts that he "was unaware of who over seen [*sic*] the investigation." Pl. Aff. ¶ 34.

Under Nunez-Rodriguez's guidance, Mills interviewed Plaintiff, Krupic, and four other witnesses. *Id.* ¶ 37.  Mills also reviewed all pertinent documentary and video evidence. Def. SOMF ¶ 39; Nunez-Rodriguez Dec. ¶ 8.  Upon concluding her investigation, Mills prepared a draft report and submitted it to Nunez-Rodriguez.  Def. SOMF ¶ 40; Nunez-Rodriguez Dec. ¶8.   Nunez-Rodriguez reviewed and adopted Ms. Mill's draft report, and submitted it to GOER-Workforce Development Unit (WDU) and Defendant's Counsel's Office. Def. SOMF ¶ 41; Nunez-Rodriguez Dec. ¶ 9 and Exhibit 2. Defendant's Counsel's Office determined that Plaintiff's allegations against Krupic were founded and recommended a referral to CNYPC's Human Resources Department.  Def. SOMF ¶ 42.  GOER-WDU approved Defendant's Counsel's Office's recommendation, as did the OMH Commissioner's designee. *Id.* ¶ 43.  On March 18, 2014, a final recommendation was issued on Plaintiff's July 1, 2013 complaint against Krupic. *Id.* ¶ 44. The March 18, 2014 final determination found "sufficient evidence to support the allegations" and recommended Appropriate Administrative Action. *Id.* ¶ 45.  Ms. Krupic was counseled on August 20, 2014, and a  Counseling Memo, dated August 25, 2014, was placed in her Personal History file.  *Id.* ¶¶ 46-47.

Regarding pre-July 1, 2013 racist comments by Krupic, Plaintiff testified at his deposition as follows:

> Q. You just mentioned while you were talking that Krupic called you a few names prior to the July 1st complaint. Can you be a little bit more specific about that? What names? When? Give me some details on what actually was occurring.
>
> A. I can't recall as far as every date and time that this woman made either racist slurs or demeaning slurs to me, but I will say from the time that I met her -- I didn't meet Krupic until I want to say -- I started in February. I didn't start working with

8

Krupic until -- we are training for a good two months. I want to say when I got out of training. So I probably didn't meet her until late April, May of 2013.  When I met her, she was telling other co-workers, Piracha -- telling him, "I don't like this kid. I'm going to get him out of here." She will say things like, "I don't like working with black people," stuff like that. Do I  remember the times and dates? No, I don't.

Q. But you remember her saying, "I don't like working with black people"?

A.  Yes.

Q.  Anything else?

A.  I mean, it was chatter. Do you know what I mean?  People say things out of the ordinary all the time. You're working with people 16 hours a day. I'm watching this lady, she's watching me 16 hours a day. I'm watching her back 16 hours a day. I'm trying to think of all the things she said but I can't remember everything because it happened so long ago, but --.

Q. It was more than the two incidents that you've itemized that she does not like working with black people and her use of the N-word; right?

A. Yes, sir.

Q. What else?

A. She used to call me up on the ward sometimes, say, "You can't get right," and then hang up on me. She will find out what ward I'm on. It was just little -- it was childish things, but, you know, eventually, when you work in a job that I worked where it's more emotional and psychological draining on you, you don't want to hear that stuff every day by the same people you're supposed to be protecting, so –

Q. As far as you can remember, was there any other time when she had any other racially harassing acts against you?

A. Other than what I listed today and what I put in [my complaint to the employer] that I can recall, no.

Pl. EBT pp.  45-46.

## IV.    DISCUSSION

Plaintiff brings Title VII claims of race-based hostile work environment, race-based discharge, and retaliation.  The Court will address the claims *seriatim*.

9

### a. Hostile Work Environment

To establish a claim of hostile work environment, a plaintiff must prove that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001); *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *Quinn v. Green Tree Credit Corp.*, 159 F .3d 759 (2d Cir.1998). A "hostile work environment claim will succeed only where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or abusive work environment,' and where the victim 'subjectively perceive[s] the environment to be abusive.'" *Richardson v. N.Y. State Dep't. of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006)(quoting *Harris*, 510 U.S. at 21-22). The objective aspect of this test is judged by a reasonable person standard. *Id.* To analyze a hostile work environment claim, the Court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)(quoting *Harris*, 510 U.S. at 23).

The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. *Brennan v. Metropolitan Opera Assn, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)(citing *Kotcher v. Rosa*

10

*and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992)).  "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Gorzynski*, 596  F.3d at 102 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also  Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010)("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe." ); *Alfano*, 294 F.3d at 376 ("the twelve incidents cited by [plaintiff], taken together, [we]re insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment"); *Williams v. Cnty. of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice) (quotation marks and citation omitted).  Courts have consistently found that a racially harassing comment is only sufficient to demonstrate a hostile work environment when it is part of a "stream of racially offensive comments," including a "veritable barrage of racial epithets." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000), *cert. denied*, 537 U.S. 1089, 123 S. Ct. 702 (2002), *rehearing denied*, 537 U.S. 1228, 123 S. Ct. 1345 (2003); *see also Fleming v. Maxmara USA, Inc.*, 2010 U.S. App. LEXIS 6134, **6-7 (2d Cir. 2010) (holding that plaintiff failed to state a hostile work environment claim based upon a single racial comment); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (finding racist comments, slurs, and jokes constitute a hostile work environment only where there are "more than a few isolated incidents of racial enmity").

Plaintiff's hostile work environment claim rests upon allegations of: (1) a July 1,

11

2013 incident in which co-worker Krupic "became agitated [with Plaintiff] . . . and mumbled out of her mouth to [Plaintiff]: 'You Nigga!'"; (2) several unidentified incidents between "late April" 2013[3] and July 1, 2013 when Krupic called Plaintiff "a 'Nigger' and questioned his level of education"; and (3) Krupic's statements to co-workers that she did not like working with black people.  Pl. 07/01/13 Compl., Def. Ex. B; *see also* Pl. EBT pp. 45-46.  However, even viewing the facts in the light most favorable to Plaintiff, a reasonable fact finder could not conclude that these incidents were part of an ongoing "stream of racially offensive comments" or a "veritable barrage of racial epithets."   Rather, Plaintiff specifically identifies only the July 1, 2013 comment that Krupic "mumbled," and asserts that "on occasion" she referred to him by the same racial epithet.  While Plaintiff stated at his deposition that Krupic would say "childish things" such as "You can't get right" that he did not want to hear "everyday," he did not provide testimony or evidence indicating that racial epithets were regularly hurled at him. *See*  Pl. EBT pp  45-46.  Thus, even viewing the facts in the light most favorable to Plaintiff, Krupic's offensive comments appear merely episodic, occurring as part of Krupic's workplace "chatter"[4] or as isolated interactions over

---

[3]In his July 1, 2013 workplace complaint, Plaintiff asserted that Ms. Krupic's harassment "dated back to June 24, 2013," yet at his deposition he asserted that the harassment started after he met Krupic in "late April, May 2013."  Because the Court must construe the facts in the light most favorable to Plaintiff, the earlier date is used.

[4]To the extend that Plaintiff did not hear Krupic tell co-workers that she did not like working with black people, the statement is inadmissible hearsay which cannot be used as opposition to a summary judgment motion. *See* Pl. EBT p. 45 ("When I met [Krupic], she was telling other co-workers, Piracha – telling him, 'I don't like this kid. I'm going to get him out of here.' She will say things like, 'I don't like working with black people,' stuff like that. Do I  remember the times and dates? No, I don't."); *Alex v. Gen. Elec. Co*, No. 112CV1021GTSCFH, 2016 WL 1057042, at *27 (N.D.N.Y. Mar. 14, 2016)("In any event, Plaintiff's deposition testimony that one or more unidentified co-workers told Plaintiff that Defendant Lanoue had referred to Plaintiff as "------" (behind her back) is inadmissible. Specifically, the alleged statements by one or more unidentified co-workers is hearsay under Fed. R. Evid. 801(a)–(c) , and is not admissible as a statement by a party or a party's employee on a matter within the scope of the employment relationship while it existed under

(continued...)

a two-month period for which Plaintiff can provide little or no details.

Further and assuming that Krupic's comments were pervasive, these episodes, although reprehensible, cannot sustain a hostile work environment claim which requires pervasive or severe conduct that alters the work environment.  *See Daniel v. T & M Prot. Res. LLC*, 87 F. Supp. 3d 621, 635 (S.D.N.Y. 2015), *appeal dismissed* (Apr. 30, 2015), *reconsideration denied*, No. 13 CIV. 4384 PAE, 2015 WL 783349 (S.D.N.Y. Feb. 24, 2015)("The 'episodic' incidents Daniel endured were not 'sufficiently continuous and concerted in order to be deemed pervasive.'")(quoting *Alfano*, 294 F.3d at 374, and citing *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004) (finding triable issue as to whether "discriminatory intimidation, ridicule, and insult" was "pervasive" where incidents were "routine" and occurred "almost daily"); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 70, 75–76 (2d Cir. 2001) (finding a triable issue where a supervisor touched plaintiff in unwelcome manner "constantly," at least on a "daily basis," and frequently engaged in other harassing behavior);  *Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 Fed. Appx. 612, 614 (2d Cir.2009) (summary order) (finding no triable issue where plaintiff was exposed to "sexually explicit and ethnically derogatory literature" on an "occasional and episodic" basis); *Negron v. Rexam Inc.*, 104 Fed. Appx. 768, 770 (2d Cir.2004) (summary order) (finding no triable issue where "on a handful of occasions [plaintiff's] coworker addressed him using a racial epithet, including once over the loudspeaker")).  Plaintiff describes Krupic's comments as part of the workplace "chatter" and as "childish," and provides little indication that her comments were so severe as to unreasonably interfered with his work

---

[4](...continued)
Fed. R. Evid. 801(d)(2)(A),(D).").

performance other than to say that he did not "want to hear that [childish] stuff every day by the same people you're supposed to be protecting." Pl. EBT pp 45-46.

Even assuming that Plaintiff's allegations constitute actionable workplace harassment, there is no basis to hold the employer responsible. When, as here, a hostile work environment is perpetrated by harassment from a non-supervisory co-worker, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). There is insufficient evidence from which a reasonable fact finder could conclude that the employer was aware, or should have been aware, of Krupic's racially derogatory statements before July 1, 2013 when Plaintiff filed his complaint against her. Moreover, it is undisputed that the employer immediately began an investigation into Plaintiff's complaint in accordance with the employer's established procedures. Still further, there is no evidence indicating that Krupic's conduct continued after Plaintiff reported her on July 1, 2013. Plaintiff's disagreement with the severity of the discipline imposed on Krupic is insufficient to establish that the employer failed to appropriately investigate or curtail the offensive conduct. Accordingly, Plaintiff's race-based hostile work environment claim is dismissed.

### b. Title VII Intentional Discrimination & Retaliation Claims

The Court next turns to Plaintiff's intentional discrimination and retaliation claims.

14

### 1.  Burden Shifting Framework

On a motion for summary judgment, Title VII racial discrimination and retaliation claims are analyzed under the well-established three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jagmohan v. Long Island R.R. Co.*, 2015 U.S. App. LEXIS 21033 (2d Cir. 2015); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 Fed. Appx. 739 (2d Cir. N.Y. 2014); *Alzawahra v. Albany Med. Ctr.*, 2012 U.S. Dist. LEXIS 156517 (N.D.N.Y. 2012).

### A.  *Prima Facie* Prong

 "First, the plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination." *Imperato v. Otsego Cty. Sheriff's Dep't*, No. 313CV1594BKSDEP, 2016 WL 1466545, at *15 (N.D.N.Y. Apr. 14, 2016)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). "The requirements to establish a *prima facie* case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012)(internal citations omitted).

"To establish a *prima facie* case of intentional discrimination, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Jagmohan v. Long Island R.R. Co.*, 2015 U.S. App. LEXIS 21033, at *3-4 (citing *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012)).

To establish a *prima facie* case of retaliation, "plaintiff must show: (1) participation

in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.,* at *5 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)) (internal quotation marks omitted).

### B.  Legitimate, Non-Discriminatory Reason for Termination

"The establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee." *Imperato*, 2016 WL 1466545, at *15 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 506).  Upon plaintiff meeting this burden, "[t]he burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination." *Janneh v. Endvest, Inc.*, 64 Fed. Appx. 814, 815 (2d Cir. 2003).  Defendant's burden of production at this stage is not a demanding one, it "need only offer a basis for the employment decision in issue which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Hickey v. Myers*, 852 F. Supp. 2d 257, 267-268 (N.D.N.Y. 2012) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) and *St. Mary's Honor Ctr.*, 509 U.S. at 509)) (internal quotation marks and citation omitted).

### C.  Ultimate Burden

"If the defendant carries that burden, the presumption of discrimination 'drops from the picture,' and the burden shifts back to the plaintiff, who must 'come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'" *Imperato*, 2016 WL 1466545, at *15 (quoting *Weinstock*, 224 F.3d at 42, and citing *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013)). "The

plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42. (internal citations, quotation marks, and punctuation omitted).

On an intentional discrimination claim, "[s]o-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ____, 133 S. Ct. 2517, 2523 (2013).  On a retaliation claim, however, "[i]f the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by retaliatory motive, using a 'but-for' causation standard." *Imperato*, 2016 WL 1466545, at *19 (citing *Nassar*, 133 S. Ct. at 2534).

## 2.  Intentional Discrimination Claim

Plaintiff contends that he was discharged because of considerations of his race. Defendant argues that "[a]ssuming that Plaintiff is a member of a protected class and qualified for the position that he held at CNYPC, he cannot establish that he suffered a cognizable adverse employment action under circumstances giving rise to an inference of racial discrimination." Def. MOL, p. 11.  The Court agrees with Defendant.

There is insufficient evidence from which a reasonable fact finder could conclude that the employer's termination was motivated by consideration of Plaintiff's race.  While

17

there is evidence that Krupic harbored a racial animosity toward Plaintiff, there is no

evidence indicating that Krupic played any role in the discharge determination or that any

of the employer's decision-makers shared in her race-based animosity.  Further, there is

no evidence of "'*the employer's* criticism of the plaintiff's performance in ... degrading

terms; or *its* invidious comments about others in the employee's protected group; or the

more favorable treatment of employees not in the protected group; or [a] sequence of

events leading to the ... adverse employment action'" from which a discriminatory animus

*by the employer* could be inferred. *Imperato*, 2016 WL 1466545, at *17 (quoting *Barella v.*

*Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. Apr. 26, 2014))(emphasis added).

Plaintiff's speculation that Defendant's decision-makers might have harbored a race-based

animus in reaching the discharge determination is insufficient to withstand summary

judgment. *See  Bickerstaff*, 196 F.3d at 456;[5] *id.* at 448.[6]

       Moreover, and assuming *arguendo* that Plaintiff could establish a *prima facie* case

of race-based intentional discrimination, he has failed to present sufficient facts from

which a reasonable fact finder could conclude that considerations of Plaintiff's race played

any role in the discharge determination. *See Nassar*, 133 S.Ct. at 2523.  As discussed

---

[5](Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.").

[6] As indicated in <u>Bickerstaff</u>, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.   This undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

<u>Bickerstaff</u>, 196 F.3d at 448 (internal quotation marks and citations omitted).

above, there is a complete dearth of evidence indicating that any of Defendant's decision-makers held any racial bias in reaching the discharge determination.   Accordingly, Plaintiff's race-based intentional discharge claim is dismissed. *See Richardson v. N.Y. Dep't. of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir. 1999).[7]

### 3. Retaliation Claim

The Court next turns to Plaintiff's claim that he was discharged in retaliation for filing a race-based harassment complaint against Krupic.

There is no legitimate dispute that Plaintiff participated in protected activity when he filed his internal discrimination complaint, that the employer was aware of this protected activity, and that Plaintiff was subjected to the adverse employment action of discharge. Thus, for purposes of the *prima facie* case, the dispute concerns only whether a causal connection existed between the protected activity and the adverse employment action.

"Close temporal proximity between a protected activity and an adverse employment action may be sufficient to establish, for the purposes of the *prima facie* test, 'the requisite causal connection between a protected activity and a retaliatory action.'" *Imperato*, 2016 WL 1466545, at *20 (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) and citing *Al Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010)).   While there is no bright-line rule for what interval of time may help to establish a causal relationship, "temporal proximity cannot support an inference of causal connection unless the retaliatory action and the protected activity were 'very close' in time." *Perry v. NSARC, Inc.*, 424 Fed. Appx. 23, 26 (2d Cir. 2011) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

---

[7](affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual).

268, 273-74 (2001)).

Here, Plaintiff's August 20, 2013 discharge occurred a little more than a month after his July 13, 2013 workplace complaint against Krupic.  This is temporally close enough to satisfy the casual connection prong of the *prima facie* case.

As indicated above, the employer offers a legitimate, non-discriminatory basis for Plaintiff's discharge, asserting that he was terminated for submitting a false statement in the context of a patient abuse investigation.

> Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for their employment actions, that reason overcomes the presumption of retaliation created by the plaintiff's prima facie case. *Zann Kwan*, 737 F.3d at 845. The defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *id.*, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S.Ct. at 2534; *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 246-47 (E.D.N.Y. 2014) (applying but-for standard to the plaintiff's retaliation claims under Title VII and NYSHRL); *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (explaining that temporal proximity alone is not sufficient to establish pretext for a retaliation claim). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845-46. The determination of whether retaliation is a "but-for" cause or just a motivating factor is "particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts." *Id.* at 846, n.5.

*Imperato*, 2016 WL 1466545, at *21.

Plaintiff's proof of pretext is exceedingly slim.  While he tries to back away from the fact that portions of his signed statement relative to the RH abuse investigation are flatly contradicted by the video evidence, his attempts to do so are weak.  Although Plaintiff denies hearing what Kunz said to RH when he entered the side room, Plaintiff admits that he witnessed Kunz enter the room.  Further, the video clearly shows Plaintiff sitting a few

feet from RH when Santomassino enters the room and can be heard telling RH not to "push the issue." Even assuming that Plaintiff was not listening to what was being said, there can be no dispute that Plaintiff was aware that Santomassino entered the side room and, while alone with RH, verbally addressed him.[8]

Thus, there can be no dispute that the portion of Plaintiff's signed statement indicating that no one other than the nurse, or someone accompanied by the nurse, entered the side room, is false. Further, there can be no dispute that Plaintiff, Kunz, and Santomassino engaged DH in conversations while DH was strapped to a bed in the side room. Thus, there can be can be no dispute that the portion of Plaintiff's signed statement indicating that DH remained "mute" the entire time he was in the side room is false.

While Plaintiff contends that the written statement was altered after he signed it, none of the alleged alterations concern the aforementioned statements. *See* Pl. EBT pp. 60-65.[9] Similarly, while Plaintiff contends that the written statement differed from his handwritten notes, it is undisputed that statement was based upon his interview with Ms. Mundy. Def. SOMF ¶ 18. Accordingly, these two issues provide little, if any, basis for a reasonable fact finder to conclude that the employer's stated reasons for discharge was a pretext for unlawful retaliation.

---

[8]Indeed, the video shows that Plaintiff moved out of Santomassino's way to allow Santomassino to enter the side room, and was sitting and looking at Santomassino while Santomassino was alone in the room talking to RH.

[9]The instances of alterations that Plaintiff pointed to during his deposition concern what appears to be RH's name "white-ed out" on page 1; a strike-out line through the words "the way to" on page 2 in the sentence that reads: "We then put his hands/arm bent @ the elbow ~~the way to~~ the way they teach you in PMCSY."; and a strike-out line through the words "see anyone" on page 3 in the sentence that reads: "I didn't see anyone, nor did I ~~see anyone~~ hit him in the neck, while in the restraint bed or hear anyone threatened to split his head open or threatened to get him where theres [*sic*] no cameras, or that Krupic will be told to say he was masturbating."

But the Court is given pause by Plaintiff's contention that he was "forced" to sign the statement or be discharged.  Pl. EBT p. 58.  When questioned at his deposition as to how it was that he was forced into signing the statement, he responded: "If I didn't sign it, I wouldn't work. They would fire you right on the spot."  *Id.*   When asked to explain what that response meant, Plaintiff stated: "This is pretty much a statement form from my investigation" regarding the June 20, 2013 RH incident in which he was involved.  *Id.* pp. 58-59.  Although Plaintiff was questioned thoroughly about the contents of the written statement, his recollection of the events of June 20, 2013, and whether he felt the statement was accurate, there was no further inquiry into how it was that he was "forced" into signing the statement. *See id.* pp. 58-72.   Plaintiff simply maintained at his deposition that the written statement he was shown at his deposition was "inaccurate." *Id.* p. 72.

Plaintiff's contention that he was forced to sign the written statement is open to two competing inferences.  One is that Plaintiff was referring to a job requirement mandating that all CNYPC staff members participate in on-going investigations into patient abuse complaints - including giving and signing statements about what was observed.  Of course, if this is what Plaintiff was referring to when he said he was forced to sign the statement, then this would not advance his retaliation claim.

A second inference is that Plaintiff was referring to an unofficial requirement that, in order to keep his job, he had to sign a knowingly false statement absolving staff members of wrongdoing related to RH's abuse complaint.  The fact that Plaintiff indicates in his affidavit that he was given the "ultimatum" to sign the statement lends some weight to the inference that he did not want to sign the statement as drafted.  From this, a reasonable

22

fact finder could conclude that the employer's stated reason for discharge was false.[10]  Of course, even if this is the situation, Plaintiff still must convince the fact finder that he would not have been given the ultimatum but for the fact that he recently filed a racial harassment complaint against a co-worker.

In light of the under-developed record surrounding the "ultimatum" Plaintiff was allegedly presented shortly after filing a racial harassment complaint against a co-worker, and because the Court cannot weigh the competing inferences that potentially arise from the situation, Defendant's motion for summary judgment on the retaliation claim must be denied.

## V.      CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [dkt. # 28] is GRANTED in part and DENIED in part.  The motion is granted in that the Title VII race-based hostile work environment and intentional discrimination claims are DISMISSED, and denied as to the Title VII retaliation claim which remains viable for purposes of trial.

**IT IS SO ORDERED.**

**Dated:**  May 20, 2016

Thomas J. McAvoy
Senior, U.S. District Judge

---

[10]While the same conclusion could be drawn in relation to Plaintiff's intentional discrimination claim, Plaintiff presents insufficient evidence from which a reasonable fact finder could conclude that considerations of Plaintiff's race played any role in the discharge determination.

23